BUCKEYE POWDER CO. v. E. I. DU PONT DE NEMOURS POWDER CO. et al.

(District Court, D. New Jersey. March 28, 1912.)

1. COURTS (§ 341*)—FEDERAL COURTS—CONFORMITY TO STATE PRACTICE.
    Under the conformity statute (Rev. St. § 914 [U. S. Comp. St. 1901, p. 684]), a federal court will follow the practice prescribed by a state statute "as near as may be," but not where it would defeat or incumber the administration of the law under federal statutes.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. § 899; Dec. Dig. § 341.*
    Conformity of practice in common-law actions to that of state court, see notes to O'Connell v. Reed, 5 C. C. A. 594; Nederland Life Ins. Co. v. Hall, 27 C. C. A. 392.]

2. MONOPOLIES (§ 28*)—ANTI-TRUST ACT—ACTIONS FOR DAMAGES—PLEADING.
    To sustain an action for damages under Sherman Anti-Trust Act July 2, 1890, c. 647, § 7, 26 Stat. 210 (U. S. Comp. St. 1901, p. 3202), the plaintiff must allege, as well as prove, that defendant committed one or more of the acts declared to be unlawful by sections 1 and 2, by either entering into a contract, combination, or conspiracy in restraint of interstate or foreign trade or commerce or monopolizing or attempting to monopolize a part of such trade or commerce, and in such clear and unambiguous language and with such reasonable certainty that the defendant and the court may be apprised of the alleged cause of action.
    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. § 28.*]

3. PLEADING (§ 64*)—ANTI-TRUST ACT—ACTIONS FOR DAMAGES—DECLARATION—DUPLICITY.
    A declaration in such an action which alleges a conspiracy to monopolize interstate commerce in certain articles is not bad for duplicity because it also alleges the making of contracts and combinations, where they are but steps in such conspiracy.
    [Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 134–137; Dec. Dig. § 64.*]

4. PLEADING (§ 360*)—MOTION TO STRIKE OUT.
    In disposing of a motion to strike out a declaration as so defective in form as to prejudice a fair trial of the cause, the court will notice and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

strike out objectionable parts, although not directly challenged, where necessary to a proper disposition of the motion.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1129–1146; Dec. Dig. § 360.*]

**5. PLEADING (§ 355*)—MOTION TO STRIKE OUT—GROUNDS.**

In an action for damages under Sherman Anti-Trust Act July 2, 1890, c. 647, § 7, 26 Stat. 210 (U. S. Comp. St. 1901, p. 3202), where a conspiracy is charged between a large number of persons and corporations named, only those who are served should be declared against as defendants, and the naming of all as defendants in the declaration, together with general references to the defendants, without specifically naming those referred to, constitutes a defect which will be corrected by the court on a motion to strike out the pleading.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1102–1110; Dec. Dig. § 355.*]

**6. MONOPOLIES (§ 28*)—ACTION FOR DAMAGES UNDER ANTI-TRUST ACT—PLEADING.**

To require the party injured by the conspiracy denounced by Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), to get out his cause of complaint with that degree of nicety and precision in stating times, places, methods, and persons required by the ordinary rules of common-law pleading, would be to nullify the beneficent purpose of the statute, and a declaration will not be stricken out, even though it may contain some statements of a general or indefinite character, if it sets out with reasonable certainty and definiteness the causes which resulted in plaintiff's injury and connects the defendant therewith, any defendant deeming himself prejudiced by any such generality of statement having the right to move for a bill of particulars.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. § 28.*]

**7. PLEADING (§ 18*)—CERTAINTY—INDEFINITENESS.**

The declaration in an action under Anti-Trust Act of July 2, 1890, c. 647, § 7, 26 Stat. 210 (U. S. Comp. St. 1901, p. 3202), to recover damages for violation of sections 1 and 2 of the act, construed, and *held* not subject to a motion to strike for uncertainty and indefiniteness of statement, but certain allegations stricken out as irrelevant.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 39, 64; Dec. Dig. § 18.*]

At Law. Action by the Buckeye Powder Company against the E. I. Du Pont de Nemours Powder Company and others. On motion to strike out declaration. Overruled.

Frank S. Katzenbach, Jr., of Trenton, N. J. (Robert H. McCarter, George S. Graham, and Thomas J. Laffey, on the brief), for the rule. MacFarland, Taylor & Costello, of New York City (Willard U. Taylor, Twyman O. Abbott, and Walter J. Bartnett, on the brief), contra.

RELLSTAB, District Judge. The plaintiff has filed his declaration against 28 persons (defendants so called), and this motion is made on behalf of the E. I. Du Pont de Nemours Powder Company, Eastern Dynamite Company, and International Smokeless Powder & Chemical Company, three of the four defendants who were served

with process. The motion is founded on section 110 of the New Jersey Practice Act (P. L. 1903, p. 569), which section is as follows:

"The court or a judge may on four days' notice strike out any pleading which is irregular or defective, or is so framed as to prejudice, embarrass or delay a fair trial of the action."

The motion takes the place of a special demurrer, deals with the form and not the substance of the pleading, and is addressed to the sound discretion of the court. More strictness is required in stating the substance of a cause of action than the form of it.

[1] The practice here authorized by the state statute, by virtue of section 914, R. S., derived from section 5 of the "Conformity Act" of June 1, 1872 (chapter 255, 17 Stat. 197 [U. S. Comp. St. 1901, p. 684]), will be followed "as near as may be," but not "where it would be inconsistent with the terms or defeat the purposes of the legislation of Congress. * * * State statutes which defeat or incumber the administration of the law under federal statutes are not required to be followed in the federal courts. Mexican Cen. R. R. Co. v. Pinkney, 149 U. S. 207, 13 Sup. Ct. 859, 37 L. Ed. 699. It follows that, where the state statute or practice is not adequate to afford the relief which Congress has provided in a given statute, resort must be had to the power of the federal court to adapt its practice and issue its writs and administer its remedies so as to enforce the federal law." Hills & Co. v. Hoover, 220 U. S. 329, 336, 31 Sup. Ct. 402, 55 L. Ed. 485. The motion will not be granted unless it is clear that a fair trial of the action on its merits is prejudiced by the form of the stated cause of action.

[2] The alleged cause of action is said to arise under section 7 of the act entitled, "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890, popularly known as the "Sherman Anti-Trust Act" (3 U. S. Comp. Stat. 1901, p. 3200). Said section is as follows:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefore in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

The unlawful things alleged to have been done by the defendants to the injury of the plaintiff are said to be denounced by sections 1 and 2 of such act, which sections are as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be

punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The first section of this act denounces restraint of interstate trade in two ways—by contract and by a combination or conspiracy—and in the second section the monopolizing and attempt to monopolize any of such trade is denounced. To maintain an action under this act, therefore, the plaintiff must allege as well as prove that the defendant committed one of such forbidden acts, and that in consequence he was injured in his business or property. Northern Securities Co. v. U. S., 193 U. S. 197–403, 24 Sup. Ct. 436, 48 L. Ed. 679; Rice v. Standard Oil Co. (C. C.) 134 Fed. 464; Cilley v. United Shoe Mach. Co. (C. C.) 152 Fed. 726; People's Tobacco Co. v. American Tobacco Co., 170 Fed. 396–407, 95 C. C. A. 566; Ware-Kramer Tobacco Co. v. American Tobacco Co. (C. C.) 180 Fed. 160. In the pleading, plaintiff must declare the forbidden acts and consequent injuries in such clear and unambiguous language, and with such reasonable certainty, that the defendants and the court may be apprised of the alleged cause of action, that it may be known by the former how to answer and prepare for trial, and by the latter what is the nature of the issue, and, if it be one of fact, to control the character of the proofs offered at the trial, and to pronounce and enforce a judgment that will settle the rights involved in such issues.

The declaration contains one count composed of 17 lengthy paragraphs, set out in the margin hereof.[1] Broadly stated, the gravamen of the declaration is that the defendants entered into contracts and combinations and conspiracies to monopolize interstate trade in powder and other explosives, and that in carrying out their monopolistic purposes they conspired to coerce the plaintiff to yield its independence as a competitor and join with the defendants on their terms in the furtherance of such unlawful purpose, or to drive it out of such business, and that they eventually succeeded in accomplishing the latter, to its great damage.

The grounds of the motion to strike out are two: First, duplicity; second, that the allegations are so defective as to prejudice the defense.

[3] As to the charge of duplicity. The defendants contend that the plaintiff has not only combined in one count all three causes for which actions are given by the Anti-Trust Act, but also alleged causes for which actions are not given by such act. Paragraph 4 of such declaration is said to allege the causes of action founded on such act, and paragraphs 5, 14, and 17 the other causes of action. Paragraph 4 does charge the making of unlawful agreements, the entering into unlawful combinations, and the maintenance of a practical-ly complete monoply. If in so doing the pleader has combined two or more distinct causes of action, the pleading is bad for duplicity. Rice v. Standard Oil Co., supra. But as a conspiracy may be accom-

1 See note at end of case.

plished by any number or variety of steps, some of which may be in the form of contracts, others as combinations, if the contracts and the combinations referred to in the declaration are but steps in such conspiracy, and such conspiracy has for its purpose the alleged monopoly, the whole constitutes but one cause of action. Connors v. United States, 158 U. S. 408, 15 Sup. Ct. 951, 39 L. Ed. 1033; United States v. Swift (D. C.) 188 Fed. 92. The matter of the fourth paragraph relates largely to transactions prior to the plaintiff's engaging in the manufacture and sales of powder, etc. In that respect it is but introductory to, and an underlaying of, the various steps constituting the conspiracy which are said to have followed, and which history is offered as furnishing the light in which such subsequent steps are to be interpreted. This is not objectionable, and may be essential to a right understanding of the cause of action said to arise from the Anti-Trust Act. United States v. E. I. Du Pont de Nemours (C. C.) 188 Fed. 127, 134, 151. Out of the matter stated in this paragraph emerges that in the year 1903, the year that the plaintiff engaged in such powder trade, the defendant the E. I. Du Pont de Nemours Powder Company (hereinafter called the New Jersey Company) was incorporated under the laws of the state of New Jersey as a. holding company, and to which, it is alleged, was transferred the controlling interest in the capital stock and properties of a large number of (named) corporations which had theretofore been engaged in such trade, including the served defendants, and in it it is alleged that certain (named) individuals erroneously called defendants, as officers and directors of two of the moving defendants, viz., the New Jersey Company and the International Smokeless Powder & Chemical Company, "instituted, directed, ratified, or approved the various unlawful and wrongful acts hereinbefore and hereinafter complained of; * * * that, by reason of the matters and things alleged and set forth in this paragraph, the defendants succeeded in establishing within themselves, and have ever since maintained, a practically complete monopoly in interstate trade in powder and other explosives amounting to about ninety-five per cent. (95%) of said entire trade, and ever since have been, and now are, engaged in a combination and conspiracy to unreasonably restrain and monopolize said trade throughout the United States and foreign countries, and have suppressed competition and have fixed prices of powder and other explosives arbitrarily and unreasonably, and have driven independent competitors out of business, or have coerced them into a sale to or union with said unlawful combination, and have unreasonably restrained trade and commerce among the several states of the United States and with foreign nations, and have committed various other unlawful and wrongful acts as hereinafter set forth, all in contravention of the laws of the United States and particularly the act of Congress of July 2, 1890, and in derogation of the rights of plaintiff to its great damage, as hereinafter set forth." The conspiracy therein alleged against the defendants, and connected with the more or less detailed statement of the various steps subsequently alleged

to have been taken in furtherance thereof, constitute but one cause of action.

The fifth paragraph, which, it is said, discloses a cause of action different from that authorized by the Anti-Trust Act, also deals in part with matters of inducement. In this instance, the introductory matter leads up to the incorporation of the plaintiff and the efforts made by its promoter to secure a favorable location for its manufacturing plant. It also sets forth various steps alleged to have been taken by the officers and agents of one of the subsidiary companies of the New Jersey Company to prevent the organization of plaintiff and its engaging in the manufacture and sale of such powder in furtherance of such conspiracy to perpetuate a monopoly in such trade.

The fourteenth paragraph, which, it is contended, also states a different cause of action, alleges that the New Jersey Company, in its purpose to prevent competition, and to secure for itself and its associates a monopoly of the powder trade, entered into a combination to control the output of the manufacturers of high grade powder-making machinery, and succeeded thereby in preventing the plaintiff, except at great cost, from obtaining machinery for the equipment of its plant. Obviously the allegations in each of these paragraphs do not relate to a cause of action other than one of those authorized by such Anti-Trust Act. The illegal acts therein charged are but steps in furtherance of the conspiracy alleged in the other paragraphs of the declaration.

In the seventeenth paragraph, which, it is said, also alleges a different cause of action, the pleader asserts that it is entitled to recover punitive or vindictive damages by reason of the malicious and wicked acts of the defendants, and particularly those of the New Jersey Company. The right thereto, however, is therein stated to be founded upon the wrongs set forth in the declaration; and, as these wrongs are said to be the mentioned violations of the Anti-Trust Act, the pleader in no sense asserts a cause of action having any other basis. The case of Ware-Kramer Tobacco Co. v. American Tobacco Co. (C. C.) 178 Fed. 117, cited by the defendants in support of their contention of duplicity as to the seventeenth paragraph, is not applicable to the case at bar. In that case the declaration contained two counts. The first count was founded upon the Anti-Trust Act; the second, upon a common-law tort. Manifestly in that declaration there were two distinct causes of action. In the cited case the decisive point was not whether a double cause of action was stated in one count, but whether the court had obtained jurisdiction over one of the defendants as to the cause of action stated in the second count. In the case at bar there is no such question. Whatever may be said of the plaintiff's characterization of the conduct of the defendants, and its assertion of its right to recover punitive or vindictive damages by reason thereof, its claim for such damages does not make the declaration bad for duplicity.

The cause of action pleaded throughout the declaration is single, and therefore is not bad for duplicity.

[4] As to the second ground, that the declaration is so defective as

to prejudice a fair trial, etc. The declaration is unquestionably irregular and defective on the several matters presently to be noted, and, while the court will not usually interfere with the form of pleading in the absence of objection, yet, where, as in this case, the form of stating the alleged cause of action is challenged, the court will exercise its undoubted prerogative to notice unchallenged defects, and expunge the objectionable parts, if necessary to a proper disposition of the motion to strike out the whole declaration.

[5] As already noted, the declaration is laid against 28 persons (called defendants), 13 of whom are corporations, and 15 individuals. Of these only 4 (corporations) have been brought into court. Only those served should have been declared against as defendants. If the conspiracy embraced others than those served, they could have been mentioned as co-conspirators, but not as defendants. Throughout the declaration the word "defendants" is frequently used, without specifically naming them, and, as by far the larger number of the persons declared against as defendants have not been brought into court, this general reference to defendants is irregular, and is bound to prove embarrassing to both the court and the parties if it is not restricted to the defendants actually served. This irregularity, however, is not sufficient to strike out the entire declaration, if by the exercise of the power of excision the rights of the parties are not infringed. The striking out of the pleading rests in the sound discretion of the court, and the power will be exercised to strike out in whole or in part, as the interests of justice in the particular circumstances require. In the present case such interests require that the names of all the persons mentioned in such declaration as defendants, except the four served, be struck out, so that the pleader's general reference to defendants will be limited to those brought into court.

[6] In support of the ground of irregularity, the moving defendants allege that the averments in paragraphs 4, 6, 7, 8, 9, 10, and 11 are too indefinite and uncertain to apprise the defendants of what they are accused, and that paragraph 13, where not indefinite and uncertain, pleads the evidence. Before taking up these criticisms seriatim, it is to be observed that the pleader has declared that the alleged conspiracy comprises a series of steps carried out in different ways. The pleader in stating them has gone to considerable length, and yet, as will be seen, in many instances has used general terms. But the use of general terms in alleging the character of such steps or some of the methods employed in performing or enforcing them, or the failure to give the names of the persons said to have figured in the furtherance and effectiveness of such conspiracy, does not necessarily condemn the pleading as irregular or defective. The very nature of a conspiracy suggests secrecy and underhand endeavors. The injurious effects of such will be readily apparent, while a proving of the times and places, plans, methods, and persons employed in consummating the nefarious purpose may be baffling to some of the conspirators themselves.

Defendants rely almost entirely upon Rice v. Standard Oil Co., supra, as authority that in the particulars pointed out by them to be

presently considered the plaintiff's allegations are too vague and uncertain. In that case the court applied strictly the well-established rules governing common-law pleadings, making no distinction, apparently, between the common-law and statutory rights of action. In view, however, of the decisions of the United States Supreme Court in which this subject-matter has been more recently considered, greater liberality than there permitted must be allowed the pleader who founds his cause of action upon the Anti-Trust Act in the form of stating the several steps which in his judgment bring his cause of action within the purview of such act. In Swift v. United States, 196 U. S. 375, 395, 25 Sup. Ct. 276, 279 (49 L. Ed. 518), the court by Mr. Justice Holmes, in answering the attack made upon a bill in equity charging a combination in restraint of trade as lacking definiteness and certainty in its statement of alleged violations of the Anti-Trust Act, said:

"A bill in equity is not to be read and construed as an indictment would have been read and construed a hundred years ago, but it is to be taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of English speech. Thus read, this bill seems to us intended to allege successive elements of a single connected scheme. * * * The general objection is urged that the bill does not set forth sufficient definite or specific facts. This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading. If, as we must assume, the scheme is entertained, it is, of course, contrary to the very words of the statute. Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place. The elements, too, are so numerous and shifting, even the constituent parts alleged are and from their nature must be so extensive in time and space, that something of the same impossibility applies to them. The law has been upheld, and therefore we are bound to enforce it notwithstanding these difficulties. * * * The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme."

Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, was considered by the Supreme Court on complaint and demurrer in an action brought under this act, similar to the one at bar, in which the court reiterated its liberal attitude in the matter of pleading an alleged cause of action founded upon the Anti-Trust Act. In Ware-Kramer Tobacco Co. v. American Tobacco Co. (C. C.) 178 Fed. 117, on special demurrer to the complaint, in a similar action to the one at bar, and in which a like attack upon the alleged cause of action was made, after a review of the cases which are here cited and others, the court said at page 125 of 178 Fed.:

"The evil at which the statute is aimed is of national importance, and the remedies provided for its punishment and repression should not be restricted by technical and narrow rules of pleading. If the plaintiff in an intelligent way and by 'a connected story' sets forth his grievance, he should not be turned away from the court or his pleading so mutilated, by striking out more or less essential averments, as to embarrass him and unduly limit the scope of his proof when he comes to trial."

To require the party injured by the conspiracy denounced by the Anti-Trust Act to set out his cause of complaint with that degree of nicety and precision in stating times, places, methods, and persons, as is required in the ordinary common-law pleading, would be to nullify the beneficent purpose of the statute. If the pleader sets out with reasonable certainty and definiteness the causes which resulted to his injury, and connects the defendant therewith, and from such allegations the defendant is apprised of the character of the accusation, and it is not apparent that he will be prejudiced in making his defense, a declaration will not be struck out, even though it may contain some statements of a general and indefinite character, and shall fail to disclose the exact times and places when some of the alleged steps in furtherance of the conspiracy were carried on, or the names of all the persons employed therein. If as to such general statements the defendant deems himself entitled to more specific information, he may apply for a bill of particulars in regard thereto; but the right of the plaintiff to have his cause judicially inquired into is not to be made dependent upon his ability to state with exactness each step or each of the several parts of a step which either from the results presumably took place or which he alleges took place. Hs is not required to allege more than is necessary to be proven, nor is he to be unduly limited in making his allegations of steps taken because at the time of making them he is not in possession of the specific data which at the trial he will find necessary to establish such step, unless such step or steps by the very framework of his pleadings are essential to his cause of action, and it is apparent that without more definite data the defendant will be prejudiced in his defense in meeting such allegation. To insist that the plaintiff insert in his declaration only such steps as would be sufficient to maintain his action would be to unduly limit or skeletonize his pleading, a course apt to prove embarrassing, if not disastrous, at the trial, where the range of evidence may be limited by the paucity of the allegations, and one which would be antagonistic to, rather than co-operative with, the legislative purpose manifested in the Anti-Trust Act.

[7] Turning now to the particular criticisms leveled by the defendants against specified paragraphs, I notice a sufficient variety of the alleged specific infirmities to illustrate the character of the objections. Paragraph 4, as noted under the head of duplicity, avers the making of contracts, the entering into combinations, and effecting a monopoly. It does not set out such agreements, or the names of the competitiors injured by such combinations and monopoly. What has been herein said as to the ground of duplicity is applicable here, viz., that this paragraph is in the main introductory to the charge of conspiracy laid by plaintiff against the defendants. The general charge of conspiracy to effect a monopoly and its results contained ·in this paragraph, standing by itself, perhaps, would be insufficient to withstand the attack of vagueness and uncertainty, but it is not intended to furnish the entire cause of action, but only the groundwork and the conditions preliminary thereto; the par-

ticular steps and development of the alleged conspiracy being found in the subsequent paragraphs.

Paragraphs 6, 7, and 8 are alleged to be uncertain and indefinite in not apprising of "the methods and devices employed to prevent the plaintiff from acquiring any portion of the powder trade," and in failing to give names, etc. An examination of these paragraphs shows that paragraph 6 avers only matter of inducement relating to trade conditions previous to the incorporation of both the plaintiff and the New Jersey Company, and how the plaintiff availed itself of a favorable location of its plant with reference to freight and transportation facilities, and that paragraphs 7 and 8, after averring that defendants entered into the conspiracy before mentioned to coerce plaintiff, and that the cost thereof was to be apportioned among such defendants ratably, and that the New Jersey Company employed every method and device known to its agents to prevent plaintiff from getting any of the powder trade, to destroy its credit and withdraw from it its customers, and the methods employed for such purpose, conclude with the statement, "as more particularly hereinafter set forth." Obviously, as far as the defendants' allegations of infirmity are concerned, these paragraphs cannot be considered alone, but must be read and interpreted in connection with the paragraphs following.

Paragraph 9 avers that the New Jersey Company, "at various times after plaintiff's plant went into operation, employed evilly-disposed persons to enter the mines of operators who had made purchases of black blasting powder of plaintiff * * * so as to induce the purchaser to reject the same, * * * and in some instances these methods succeeded, * * * and by reason of such wrongful and wicked conduct certain consignments of powder from plaintiff's mills were from time to time rejected." These allegations are very general, and the subject-matter is one that carries the suggestion that more particular knowledge of the dates when and the mines where such occurrences took place, and the customers lost by such methods, is in the possession of the plaintiff than stated. This knowledge, however, can be had on demand for a bill of particulars; and as the plaintiff on the argument hereof, and reiterated in the briefs, offered to furnish greater particulars of any of its averments, if required, defendants will be relieved of any supposed prejudice from the generality of the allegations by taking that course. The further averment in this paragraph that various committees of the miners waited upon the plaintiff, proposing to withdraw their opposition to plaintiff's powder for a consideration, is impertinent and irrelevant to any issue that can be raised in the cause, and should be stricken out. The further averment in this paragraph concerning the mingling of defendant's employés with such miners to induce them to reject plaintiff's powder does not give the names of any such persons. As the names of the defendant's employés ordinarily are more likely to be known by defendants, if such averment accords with the fact, that allegation will not be struck out. The same ruling applies to the failure to name some of the persons in the allegations of the tenth paragraph, where it is charged

that the New Jersey Company "on various occasions caused various persons to seek employment with plaintiff for the purpose * * * of obtaining its manufacturing and business secrets, * * * and enlisted the services of employés of various railway companies * * * to furnish reports on all shipments made by plaintiff from its mills, and said information was made use of in various ways to induce said consignees to reject shipments, * * * and in some cases such customers were thereby induced to desert plaintiff and in other cases to reject the shipments already consigned." If the defendants desire more specific data as to the names of the customers and consignees who were so induced to desert the plaintiff or reject purchases of powder, the plaintiff may also in this respect be called upon by a bill of particulars to furnish it. The same course may be taken as to the failure of the pleader in paragraph 11 to give the name of a consumer who was induced to withdraw his trade from the plaintiff by means of the methods of the defendant stated in that paragraph.

Paragraph 13 recites an explosion at plaintiff's mills, which, it is alleged, was exaggerated by the New Jersey Company to create a feeling of distrust among plaintiff's customers of its ability to meet future requirements, with the purpose of obtaining its customers, etc. So much of the paragraph as relates to the manner of the explosion and its effect upon the plant and employés is evidential, and in some respects irrelevant in character, but as it may be treated as introductory to the complained of acts of the New Jersey Company in relation to such explosion, and as it can in no way embarrass or prejudice the defendants in their defense, it will not be struck out.

Taking the declaration as a whole, it discloses several and various steps alleged to be in furtherance of the conspiracy to prevent legitimate competition in such powder trade. These steps are: Efforts to frustrate the organization of the plaintiff and to prevent it from securing any or a favorable site for its plant; attempts to coerce it into combination with such defendant or to drive it out of business, as by seeking to induce each consumer of the kind of powder manufactured by plaintiff to enter into long-time contracts with defendant to give it the exclusive trade in such powder; to remove such consumers from the open market for a sufficiently long time to prevent plaintiff from getting enough business to run its mills on a profitable basis; that such contracts were obtained sometimes by secret rebates and special prices, by threats to prevent plaintiff's customers from obtaining powder not manufactured by plaintiff, by circulating exaggerated reports of mishaps at plaintiff's mills to create misgiving among its customers of its ability to meet their future requirements; by false statements of the quality of the plaintiff's powder, by threats to discredit its customers' solvency among their creditors, and by offers of financial assistance; that, when such contracts were not made, other coercive steps were taken, such as selling below cost in certain areas to destroy competition, while maintaining excessive prices in territory not entered by independent companies in order to recoup its losses sustained by such underselling; underselling plaintiff, regardless of price; obtaining by corrupt means confidential information about plaintiff's

business and customers; attacking its and its customers' credit by false reports of their solvency; tampering with its processes of manufacture; destroying its property; causing employés in mines where plaintiff's powder was used to refuse to use it; entering into combination with the manufacturers of high-grade powder making machinery to control their output exclusively with the purpose of preventing plaintiff from obtaining its needed machinery to install and run its powder-making plant.

The declaration in the Loewe v. Lawlor Case, set out in full in the margin of the reported opinion, and which was there held to show a case within the statute, is not so different in respect to the generality of many of its allegations from the declaration here considered as to admit of a different finding, if the objections related to its declared cause of action, rather than the form of stating it. While many of the matters that may be considered on a motion to strike out could not be entertained on general demurrer, nevertheless, it cannot be held that the allegations herein attacked are so vague and indefinite as to prejudice the defendant in making answer thereto.

The motion to strike out the declaration is denied, but the parts herein specifically condemned as faulty are expunged therefrom without costs to either party.

NOTE.—The following is the declaration referred to in the opinion:

DECLARATION.

Action under Section 7 of Act of Congress of July 2, 1890.

To the Honorable Judges of the Above-Entitled Court:

The E. I. Du Pont de Nemours & Company (a corporation of Delaware), E. I. Du Pont de Nemours Powder Company (a corporation of New Jersey), E. I. Du Pont de Nemours & Company (a corporation of Pennsylvania), Du Pont International Powder Company (a corporation), Delaware Securities Company (a corporation), California Investment Company (a corporation), Delaware Investment Company (a corporation), the Hazard Powder Company (a corporation), Laflin & Rand Powder Company (a corporation), Eastern Dynamite Company (a corporation), Fairmont Powder Company (a corporation), International Smokeless Powder & Chemical Company (a corporation), Judson Dynamite & Powder Company of California (a corporation), Alexis I. Du Pont, Alfred I. Du Pont, Eugene Du Pont, Eugene E. Du Pont, Pierre S. Du Pont, Henry F. Du Pont, Irenée Du Pont, Francis I. Du Pont, Thomas Coleman Du Pont, Victor Du Pont, Jr., Jonathan A. Haskell, Arthur J. Moxham, Hamilton M. Barksdale, Edmond G. Buckner, and Frank L. Connable, the defendants in this suit were summoned to answer the Buckeye Powder Company, the plaintiff therein, in an action for damages under the seventh section of the act of Congress of July 2, 1890, known as the "Sherman Act"; and thereupon the plaintiff, by MacFarland, Taylor & Costello, its attorneys, complains as follows, to wit: Whereas

First. That plaintiff, is and has been ever since on or about the 15th day of February, 1903, a corporation duly organized and existing under the laws of the state of Delaware; that the purpose of the incorporation and organization of plaintiff was to carry on the business of manufacturing and selling powder and other explosives, and particularly black blasting powder; that it began such business on or about the 1st day of September, 1903, and continued in and conducted said business down to the 19th day of September, 1908, and during all of said period its business was interstate and conducted in the state of Illinois, Iowa, Indiana, Ohio, Michigan, Minnesota, Missouri, Montana, Kansas, Nebraska, Colorado, Wyoming, West Virginia, and Indian

Territory, and the foreign country of Mexico; that during all of said period it manufactured black blasting powder in the state of Illinois for the purpose of selling the same in the states, territory, and foreign country above mentioned, and the same was sold and delivered to purchasers in said states, territory, and foreign country.

Second, That the defendant E. I. Du Pont de Nemours & Company is, and has been ever since the 26th day of February, 1902, a corporation organized and existing under the laws of the state of Delaware; that the defendant E. I. Du Pont de Nemours Powder Company is, and has been ever since the 19th day of May, 1903, a corporation organized and existing under the laws of the state of New Jersey; that the defendant E. I. Du Pont de Nemours & Company of Pennsylvania is, and has been ever since the 11th day of September, 1903, a corporation organized and existing under the laws of the state of Pennsylvania; that the Du Pont International Powder Company is, and has been ever since the 14th day of December, 1903, a corporation organized and existing under the laws of the state of Delaware; that the defendant the Delaware Securities Company is, and has been ever since the 20th day of September, 1902, a corporation organized and existing under the laws of the state of Delaware; that the California Investment Company is, and has been ever since the 7th day of April, 1903, a corporation organized and existing under the laws of the state of Delaware; that the Delaware Investment Company is, and has been ever since the 20th day of September, 1902, a corporation organized and existing under the laws of the state of Delaware; that the Hazard Powder Company is, and was during the times hereinafter mentioned, a corporation organized and doing business under the laws of the state of Connecticut; that the defendant Laflin & Rand Powder Company is, and was during the times hereinafter mentioned, a corporation organized and doing business under the laws of the state of New York; that the defendant the Eastern Dynamite Company is, and was during the times hereinafter mentioned, a corporation organized and doing business under the laws of the state of New Jersey; that the defendant Fairmont Powder Company is, and was during the times hereinafter mentioned, a corporation organized and existing under the laws of the state of West Virginia; that the defendant the International Smokeless Powder & Chemical Company is, and was during the times hereinafter mentioned, a corporation organized and existing under the laws of the state of New Jersey; that the defendant Judson Dynamite & Powder Company of California is, and was during the times hereinafter mentioned, a corporation organized and existing under the laws of the state of California; and the defendants and each of them are, and were during the times hereinafter mentioned, engaged in interstate trade and commerce in the shipment and sale of gunpowder and other high explosives among the states and territories of the United States and in foreign countries.

Third. That the individual defendants, Thomas Coleman Du Pont, Pierre S. Du Pont, Alexis I. Du Pont, Alfred I. Du Pont, Eugene Du Pont, Eugene E. Du Pont, Henry F. Du Pont, Irenée Du Pont. Francis I. Du Pont, Victor Du Pont, Jr., Arthur J. Moxham, Hamilton M. Barksdale, Edmond G. Buckner, Frank L. Connable, and Jonathan A. Haskell are and each of them is a citizen and resident of the state and district of Delaware, and said individual defendants, and each of them as officers and directors of the defendants mentioned in the last preceding paragraph, or some of them, have participated in, directed, and managed their affairs in the conduct of the interstate trade aforesaid.

Fourth. Plaintiff shows that for a long time previous to the year 1902, to wit. for a period of more than 30 years and by means of many agreements and the adoption of many forms, certain manufacturers and vendors of powder and other explosives in the United States and foreign countries, including some of the defendants above mentioned, had attempted to establish, and in a measure had succeeded in establishing, a more or less complete monopoly of said trade in their own hands; that by forcing their competitors out of business or coercing them into a union with them, by imposing fines and penalties for violation of said agreements to monopolize

said trade, by limiting the output of the various parties to said agreements, by apportioning the share of business among the said parties, and by dividing the said trade among themselves, by fixing the prices of said powder and other explosives arbitrarily and not according to any law of supply and demand, the said manufacturers and vendors became and continued to be an unlawful combination for the purpose of restraining interstate trade and commerce within the United States and foreign countries; that on or about the 9th day of February, 1902, the defendants Thomas Coleman Du Pont and Pierre S. Du Pont, with the intent and purpose of securing a more complete monopoly and a more effective control of the powder trade in the United States and foreign countries, caused the defendant E. I. Du Pont de Nemours & Company to be organized under the laws of the state of Delaware as a corporation under the name of the E. I. Du Pont de Nemours Company (which name was subsequently changed to the name now borne by said defendant): and thereupon the said defendant E. I. Du Pont de Nemours & Company entered upon the policy of securing the actual physical or legal control and ownership of all the plants, manufactories, and tangible property theretofore partially controlled by them, or, theretofore co-operating with them, to monopolize the powder trade aforesaid, and to vest the absolute ownership thereof in said E. I. Du Pont de Nemours & Company and to dissolve and destroy their entity, so that there could not be any interference with the plans of said defendant to completely monopolize the powder trade in the United States and foreign countries: that in pursuance of said policy and purpose the said defendant E. I. Du Pont de Nemours & Company thereafter succeeded in absorbing or acquiring control of a large number of said plants, manufactories, and tangible property and of the corporations owning and operating the same. And plaintiff further shows that notwithstanding the success of said defendant E. I. Du Pont de Nemours & Company in its efforts to monopolize the said trade, not being satisfied with the completeness of its monopoly, and seeking to make said control absolute, on the 19th day of May, 1903, caused the defendant E. I. Du Pont de Nemours Powder Company to be organized under the laws of the state of New Jersey with a capital stock of fifty million ($50,000,000) dollars to act as a holding company of the various properties, manufactories, and plants which had already been or might thereafter be acquired by it; and thereupon the said defendant E. I. Du Pont de Nemours & Company, in consideration of the issuance to it of thirty million two hundred thousand ($30,200,000) dollars par value of the capital stock of the said E. I. Du Pont de Nemours Powder Company, sold, assigned, and transferred to said E. I. Du Pont de Nemours Powder Company, all the right, title, and interest which it possessed in or to any of the plants, manufactories, or properties hitherto acquired by it, and thereby placed within the absolute control of the said E. I. Du Pont de Nemours Powder Company the property, plants, and manufactories and the business of the following named corporations, and thereupon caused said corporations to be dissolved and destroyed and removed from the business of manufacturing and selling powder and other explosives, to wit: Blue Ridge Powder Company, U. S. Dynamite Company, Laflin Powder Manufacturing Company, Hudson River Powder Company, Acme Powder Company, Columbia Powder Company, Dittmar Powder & Chemical Company, Mr. Wolf Dynamite Company, Rock Glycerine Company, Sterling Dynamite Company, Atlantic Dynamite Company of New Jersey, Atlantic Dynamite Company of New York, Hecla Dynamite Company, Hercules Powder Company, Repauno Chemical Company, Repauno Manufacturing Company, Clinton Dynamite Company, A. Kirk & Son Company, Robina Fuse Company, Weldy Dynamite Company, Oliver Dynamite Company, Monarch Powder Company, Forcite Powder Company of New Jersey, Forcite Powder Company of New York, New York Powder Company of New Jersey, New York Powder Company of New York, Electric Powder Company, Joplin Powder Company, Shenandoah Powder Company, Brooklyn Glycerine Manufacturing and Refining Company, Pennsylvania Torpedo Company, A. S. Speece Powder Manufacturing Company, Giant Manufacturing Company, Standard Exporting Company, Limited, Metropolitan Powder Company, Climax Powder Manufacturing Company, Explosives Supply Company,

American Stor. and Deliv. Company, Atlantic Manufacturing Company, Hudson River Wood Pulp Manufacturing Company, National Torpedo Company, Producers' Powder Company, Chattanooga Powder Company, Lake Superior Powder Company, Ohio Powder Company, American Forcite Powder Manufacturing Company, Hecla Powder Company, Anthracite Powder Company, Globe Powder Company, Marcellus Powder Company, H. Julius Smith Electric Fuse Company, James Macbeth & Co., Phœnix Powder Manufacturing Company, Conemaugh Powder Company, Enterprise High Explosive Company, Schaghticoke Powder Company, California Vig Powder Company, California Powder Works, Western Torpedo Company, Oliver Powder Company, Thompson Torpedo Company, E. I. Du Pont Company, King Mercantile Company, and Mahoning Powder Company; and thereupon the said E. I. Du Pont de Nemours Powder Company became possessed of a controlling interest in the capital stock of each of the defendants herein, to wit: Hazard Powder Company, the Laflin & Rand Powder Company, the Eastern Dynamite Company, the Fairmont Powder Company, the International Smokeless Powder & Chemical Company, the Judson Dynamite & Powder Company, the Delaware Securities Company, the Delaware Investment Company, the California Investment Company, the E. I. Du Pont de Nemours Company of Pennsylvania, and the International Powder Company. And plaintiff further shows that the defendants Thomas Coleman Du Pont, Pierre S. Du Pont, Alexis I. Du Pont, Alfred I. Du Pont, Eugene Du Pont, Eugene E. Du Pont, Henry F. Du Pont, Irenée Du Pont, Francis I. Du Pont, Victor Du Pont, Jr., Jonathan A. Haskell, Arthur J. Moxham, Hamilton M. Barksdale, and Frank L. Connable, as officers and directors of the said defendants E. I. Du Pont de Nemours & Company, and E. I. Du Pont de Nemours Powder Company, and the defendant International Smokeless Powder & Chemical Company, or one of them, and the defendant Edmond G. Buckner, as a director of the said defendant International Smokeless Powder & Chemical Company, and each and all of them, have instituted, directed, ratified, or approved of the various unlawful and wrongful acts hereinbefore and hereinafter complained of. And plaintiff further shows that by reason of the matters and things alleged and set forth in this paragraph the defendants succeeded in establishing within themselves, and have ever since maintained, a practically complete monopoly in interstate trade in powder and other explosives amounting to about ninety-five per cent. (95%) of said entire trade, and ever since have been and now are engaged in a combination and conspiracy to unreasonably restrain and monopolize said trade throughout the United States and foreign countries, and have suppressed competition, and have fixed prices of powder and other explosives arbitrarily and unreasonably, and have driven independent competitors out of business, or have coerced them into a sale to or union with said unlawful combination, and have unreasonably restrained trade and commerce among the several states of the United States and with foreign nations, and have committed various other unlawful and wrongful acts as hereinafter set forth, all in contravention of the laws of the United States and particularly the act of Congress of July 2, 1890, and in derogation of the rights of plaintiff, to its great damage, as hereinafter set forth.

Fifth. Plaintiff shows that, a short time previous to the date when plaintiff was incorporated and organized as hereinbefore set forth, one R. S. Waddell, who afterwards became its president and general manager, conceived the idea of organizing, and afterwards perfected the organization, of plaintiff for the purpose of entering into the business of the manufacture and sale of black blasting powder, and his active experience and acquaintance with the powder trade in the United States and foreign countries for a period of more than 30 years enabled him to determine with scientific accuracy the best and most practical field for successful operation of a plant with which to conduct such business; that the defendants well knew of the experience and ability of said Waddell as a powder expert and salesman, and well knew that his acquaintance with the powder trade was wide and accurate; that as soon as the said defendants became aware of the purpose of the said Waddell to organize plaintiff and engage in the manufacture and sale of black blasting powder, and with the intent and purpose

to perpetuate the monopoly which they had already acquired as aforesaid, entered into a conspiracy to prevent him from carrying out his said purpose, and the officers and agents of the defendant E. I. Du Pont de Nemours & Company endeavored to dissuade the said Waddell from carrying out his said purpose, failing in which they then offered to join him in conducting said business upon the condition that he would place the said defendant E. I. Du Pont de Nemours & Company in control of said plaintiff's business and affairs, and failing to obtain the consent of the said Waddell thereto, the said officers and agents then endeavored to influence him to cause the plant of the plaintiff to be located in a sparsely settled region, where the development of the market for black blasting powder had been comparatively slow and not of sufficient consequence to justify the hope of prosperous returns. Finding that the said Waddell could not be moved in his purpose to select a location and site for the plant and mills at a point where the powder trade was already largely developed and rapidly developing, the said officers and agents thereupon immediately formed a plan to prevent him from carrying out his purpose of organizing your plaintiff and engaging in the business of manufacturing and selling powder and other explosives, thus planning to retain the monopoly of said trade, and with this end in view they placed detectives on the track of the said Waddell to shadow him throughout the United States as he should journey from place to place in search of a location, to keep them advised of his movements, and to enable them through their emissaries to forestall him in obtaining a location, and to create opposition to the location of plaintiff's plant in such place as might be decided upon, by instilling fear into the minds of the people thereabout, and also, if need be, by entering into competition with the plaintiff for the purchase of sites and bidding up the price of said property, not, however, with any purpose to make use of the same themselves, but to prevent the entrance of an independent competitor for the powder trade in the states, territory, and foreign country aforesaid, and with a view of altogether preventing plaintiff from finding a site for its mills and plant; that by reason of the matters and things set forth in this paragraph the said Waddell was compelled to travel from place to place with great secrecy, and sometimes under assumed names, and to adopt various disguises to avoid being interfered with, and the said Waddell was thereby compelled to spend much time and money in an effort to avoid the unjustifiable surveillance to which the said defendants subjected him while in the pursuit of a lawful calling and while engaged in the rightful exercise of the privileges guaranteed to citizens of the United States by the laws of the land.

Sixth. Plaintiff shows that, by reason of the dangerous nature of powder and other explosives, the matter of freight rates and transportation facilities are important and often controlling factors in determining the price or prices at which the same can be delivered to the consumer profitably and economically; and for this reason the powder trade of the United States and adjoining countries, if left free to adjust itself naturally, would tend to the establishment of many local plants and to active competition between manufacturers, and would thereby result in great benefit to the consumer, and would thereby tend to maintain prices at such figures as would produce reasonable and living profits to the manufacturer; that this is particularly true of black blasting powder, which is most commonly used in coal mining operations; that long experience has demonstrated that one pound of such powder will be consumed on the average to each ton of coal mined. Plaintiff further shows that by reason of the matters and things set forth in this paragraph, and by reason of the fact that there was previous to the year 1903 a great extension of coal mining operations and a large and rapidly developing trade in black blasting powder in the states of Illinois, Iowa, Indiana, Ohio, Michigan, Minnesota, Missouri, Montana, Kansas, Nebraska, Colorado, Wyoming, West Virginia and Indian Territory, and the foreign country of Mexico, the promoters of the business in which plaintiff was organized to engage, with the intent and purpose to supply a natural market and demand and to conduct a legitimate and profitable business in the manufacture and sale of black blasting powder, selected a point near the city of Peoria, state of Illinois, as the most favorable location for its plant and

196 F.—34

mills and constructed the same at said point; that said city of Peoria was at said time and ever since has been favorably situated with respect to railroad facilities and transportation, and has had and still has the benefit of favorable freight rates due to competitive transportation conditions; that, by reason of the superior transportation facilities and freight rates thus afforded, plaintiff was assured of a vast market for its product as aforesaid. And plaintiff further shows that the natural and normal increase of the consumption of black blasting powder in said states, territory, and foreign country, for a long time previous to the location and construction of its said plant and mills, was much more than sufficient to have absorbed the entire output thereof, working at their full capacity, without diverting any of the trade already established from the usual channels of supply, and without disturbing any existing business of any other manufacturer thereof.

Seventh. Plaintiff shows that by reason of the favorable location of its mills and plant as hereinbefore alleged, and by reason of the superior facilities of transportation and freight rates afforded thereby, it was able to meet the requirements of consumers of black blasting powder in the states, territory, and foreign country above mentioned, at the lowest price at which the same could be made and supplied and leave a fair and living profit; that it was willing and able to engage in fair and open competition for the said trade with any other manufacturer or manufacturers of black blasting powder; that defendants, well knowing this fact, but being desirous to prevent fair and open competition, or in fact any competition at all, and with the design and intent to coerce plaintiff into a combination with said defendants, or to drive it out of business, and thereby stifle competition in said district, entered into a conspiracy with each other, whereby all the other defendants except the E. I. Du Pont de Nemours Powder Company agreed to retire from the business of supplying or competing for the trade in said states, territory, or foreign country, and thus leave the said E. I. Du Pont de Nemours Powder Company a clear field to carry on a war of extermination against plaintiff and drive it out of business; and in pursuance of said agreement and as part thereof an arrangement was made between said conspirators whereby all losses were to be apportioned among them ratably, and whereby the said defendant E. I. Du Pont de Nemours Powder Company should be compensated for all losses which it might incur or suffer in carrying on such war of extermination. Thereupon the said defendant E. I. Du Pont de Nemours Powder Company appointed a committee (known and designated as "the Peoria Committee") to have charge of and conduct said fight against plaintiff, and in further pursuance of said arrangement, for the purpose of enabling the defendant E. I. Du Pont de Nemours Powder Company to conduct a more effective campaign against your petitioner, all of the other defendants withdrew their agencies from said city of Peoria and ceased all effort to secure any of the trade in black blasting powder for themselves within said states, territory, and foreign country, taking in lieu thereof certain allotments of trade elsewhere to compensate them for the trade thus yielded; that thereupon the said defendant E. I. Du Pont de Nemours Powder Company began and continued a most determined, bitter, and disastrous warfare against plaintiff to destroy its business and prevent it from acquiring any new business and to drive it out of business entirely, as more particularly hereinafter set forth.

Eighth. Plaintiff further shows that the defendant E. I. Du Pont de Nemours Powder Company instituted shortly after the organization of said company, and maintained and still maintains as a part of its organization for the more effective prevention and suppression of competition, a department or bureau known as the "Bureau of Information" (sometimes called "Trade Reports Bureau"); that the headquarters of said bureau was established and has since been kept at the head office of said defendant in the city of Wilmington, Delaware; that said bureau has maintained and still maintains a system of agents, emissaries, spies, and detectives throughout the various states and territories of the United States and in some foreign countries for the purpose of collecting and reporting all facts, rumors, and information of every kind concerning the trade in powder and other explosives, and concerning the various consumers and manufacturers of the

same; that said agents, emissaries, spies, and detectives are from time to time instructed and required to collect such facts, rumors, and information in any manner which they may deem necessary for that purpose and without regard to the means employed; that by reason of said instructions and requirements the said agents, emissaries, spies, and detectives have resorted to various questionable and corrupt practices for the purpose of obtaining such facts, rumors, and information, and said defendant has thereby built up and maintained a system of espionage upon the business and private affairs of persons, corporations, and associations engaged in legitimate occupations throughout the United States and foreign countries entirely at variance with the genius of the government of the United States and in contravention of the statutes and laws of the land; that from time to time a vast amount of facts, rumors, and other information has been collected and forwarded to said Bureau of Information, and the same has been tabulated and arranged into three divisions, designated as White, Yellow, and Red Divisions; that the White Division contains reports concerning consumers and manufacturers who are classed as loyal to the said defendant E. I. Du Pont de Nemours Powder Company and whose loyalty may depended upon under all circumstances: that the Yellow Division contains reports of consumers and manufacturers who are considered as friendly to said defendant, but untrustworthy, and whose movements must be watched, and who must be dealt with as the circumstances may seem to require from time to time, and who are kept under close surveillance and espionage to prevent the loss of their trade, support, and co-operation; that the Red Division contains reports of consumers and manufacturers known to be independent, and who are ready and willing at all times to enter the open market and encourage competition in the powder trade, and who are, therefore, classed as enemies to said defendant and dangerous to its monopoly, and who are marked for the most vigorous methods which can be brought to bear to coerce them into a union with the defendants or to completely drive them out of business, and the agents, emissaries, spies, and detectives of the E. I. Du Pont de Nemours Powder Company are required to increase their vigilance and espionage and seize upon every opportunity to annoy, embarrass, and injure them in such business; and for this purpose such agents, emissaries, spies, and detectives are authorized to stir up strife between employers and employés, to encourage creditors to institute legal proceedings, to create false and malicious rumors concerning their solvency, and generally do any and every thing which would tend to discredit and embarrass them, and to make full reports of all such false and fictitious conditions thus sedulously and wickedly created by themselves; that it has long been the practice with said Bureau of Information to select certain facts, rumors, and other information and spread them broadcast among the powder trade, where they would produce the greatest damage to such consumers and manufacturers included within the class known as the Red Division, in order to force them to ally themselves with said defendant and co-operate with it in maintaining its monopolistic control of the powder trade or drive them out of business entirely. And plaintiff further shows that plaintiff and its customers were classed by said bureau with the division known as the Red Division, and that every method and device known to the said bureau and its agents, emissaries, spies, and detectives was employed to prevent it from acquiring any portion of the powder trade and to prevent consumers of black blasting powder from purchasing the same from it, and to induce its customers to abandon it, and to injure and destroy its credit by creating distrust among its creditors, and by circulating false and malicious rumors regarding its solvency, and by circulating false and malicious statements concerning the quality of the powder manufactured by petitioner, and by stirring up strife between miners and operators, thereby to induce said miners to refuse to use the powder manufactured by plaintiff, and by circulating false and malicious reports concerning the solvency of customers of the plaintiff, for the purpose of embarrassing them among their creditors and forcing them to abandon plaintiff, and by secretly sending its emissaries and spies into plaintiff's mills and plant to learn the secrets of its business and tampering with its processes, and to destroy its buildings

and machinery, and by employing the agents of various transportation companies to furnish information of the consignments from plaintiff's mills and the names and addresses of the consignees, and thereafter inducing said consignees to reject said consignments by offering to furnish them black blasting powder below the price contracted with the plaintiff, and below any price which plaintiff might see fit to offer, and below the actual cost of said powder if necessary to secure said trade, all as more particularly hereinafter set forth.

Ninth. Plaintiff shows that there was, during the period while plaintiff was engaged in the manufacture and sale of powder, an association known as the "Coal Operators' Association," composed of the owners and operators of coal mines in the state of Illinois and other states, and another association known as the "Miners' Union," composed of miners engaged in mining said mines; that annually, or as often as might appear to be necessary, an agreement was regularly entered into between said associations to the effect that the members of the Operators' Association should originally purchase all powder necessary to be used in the mining operations to be carried on in all mines owned or operated by them, and that the members of the Miners' Union would buy of the operators all the powder used by them in performing the work in such mines, at the agreed price of one dollar and seventy-five cents ($1.75) per keg; that said price was fixed and unchangeable during the life of said agreement, regardless of the price at which the operators might be able to purchase said powder; that these agreements have sometimes produced discord between the members of the two associations, and have sometimes led to claims of injustice on the part of the miners against the operators by reason of the variation in the prices at which the operators may have been enabled to purchase the powder from the manufacturer. And plaintiff shows that the defendant E. I. Du Pont de Nemours Powder Company, at various times after plaintiff's plant went into operation, employed evilly-disposed persons to enter the mines of operators who had made purchases of black blasting powder of plaintiff, for the purpose of stirring up discontent among the miners and to instill into their minds prejudice against said powder, and to cause them to refuse to use the same, so as to induce the purchaser to reject the same, intending and planning thereby to secure to itself the business of said operators; and in some instances these methods succeeded in producing boycotts by said miners against the powder manufactured by plaintiff, and by reason of such wrongful and wicked conduct certain consignments of powder from plaintiff's mills were from time to time rejected and returned, and further purchases were discontinued through fear of causing disagreements and disturbances which would lead to shut-downs and idleness. Plaintiff further shows that such a condition was the more easily created by reason of the fact that the Miners' Union always reserved the right under said agreements to select the grade and make of powder which the operator was bound to purchase; and in order to foment unjust opposition and strife, certain persons were employed by said defendant E. I. Du Pont de Nemours Powder Company to travel from place to place and mingle with the miners of the various coal mines to insidiously induce them to believe that it was for their interest to reject the powder manufactured by the plaintiff, and certain influential miners were employed to make use of their influence with their fellow workmen to induce them to boycott such powder; that in some cases intoxicating liquors were distributed among said miners, sometimes clothing, food, and household articles were distributed among said miners and their families, and sometimes cash was paid to various of said miners to obtain their co-operation and influence with their fellow workmen as aforesaid; that these methods were sometimes carried to such an extent as to become open and public scandals, and from time to time various committees of said miners waited upon the officials of plaintiff with propositions to desist in their opposition if plaintiff would increase the compensation which they were already receiving from said defendant, its agents, and emissaries; that by reason of the matters and things alleged in this paragraph the good order and peace of the community was disturbed and set at naught, and the morals of said employés corrupted, and the coal mining business of said

operators was disturbed, and serious loss was occasioned and threatened to them, and the said operators almost invariably yielded to the demands thus fictitiously created and refused to make further purchases from plaintiff.

Tenth. Plaintiff shows that the defendant E. I. Du Pont de Nemours Powder Company on various occasions caused various persons to seek employment with plaintiff for the purpose of entering its mills and plant and obtaining its manufacturing and business secrets, and plaintiff, being ignorant of the purpose of said persons in seeking employment, and not suspecting their duplicity and fraud, and being desirous of obtaining their services, gave employment to some of such persons, and particularly to one Colburn, who was employed as a competent and trustworthy person to act as superintendent of its plant and mills; that subsequently plaintiff ascertained that said Colburn prepared frequent reports of its business, and of the various processes used by it, and of the amount of powder manufactured and shipped by it, and of the names and addresses of the consignees, all of which were regularly transmitted to the defendant E. I. Du Pont de Nemours Powder Company at Wilmington, Delaware; and in other instances the said defendant E. I. Du Pont de Nemours Powder Company succeeded in enlisting the services of employés of various railway companies receiving powder from plaintiff for transportation to its customers (particularly certain employés of the Chicago, Burlington & Quincy Railroad Company) to furnish said defendant with daily telegraphic reports of all shipments made by plaintiff from its mills and passing through their hands; that sometimes in consideration of said services said defendant agreed to pay and did pay said railway employés one dollar ($1) for each telegram and five dollars ($5) for each letter sent to the said defendant or any of its agents or emissaries and carrying any such information; and said defendant agreed to and did pay others of said employés various sums of money by way of salary. And plaintiff further shows that immediately, and continuously for a long period of time. the information so obtained was made use of by the said E. I. Du Pont de Nemours Powder Company in various ways to induce said consignees to reject shipments from, and to abandon, plaintiff and thereafter to purchase black blasting powder of said defendant exclusively, and in some cases such customers were thereby induced to desert plaintiff, and in other cases to reject the shipment already consigned.

Eleventh. Plaintiff shows that the said E. I. Du Pont de Nemours Powder Company, as a part of its plan to create and maintain a monopoly in the powder trade of the United States and foreign countries, and intending to ruin plaintiff and drive it out of business, sought to make it impossible for plaintiff to secure any trade whatsoever in said states, territory, or foreign country by inducing each consumer of black blasting powder therein to enter into a secret contract with said defendant whereby said consumer bound himself to give the said defendant his exclusive trade in said powder for a term of years, varying from one to five years; that said contracts were secured sometimes by promises of special privileges and prior right over other persons for delivery, sometimes by threats to deprive such consumer of the right to purchase other grades of powder and explosives not manufactured by the plaintiff, sometimes by misrepresenting the capacity of plaintiff's mills and plant, sometimes by circulating false and damaging statements through its agents and emissaries concerning accidents at plaintiff's mills and plant, sometimes by false and malicious statements concerning the quality of plaintiff's powder, sometimes by threats to discredit such consumer's solvency among his creditors, sometimes by offers of financial assistance to such consumers, sometimes by stirring up strife among the employés of such consumer as hereinbefore alleged, and by various other unlawful and wicked conduct. And plaintiff further shows that the terms of said contracts, and even the existence thereof, were in all cases made strictly confidential, for the reason that the said defendant well knew that said contracts were unjust, unfair, unlawful, and that they were especially contrary to the act of Congress known as the "Sherman Act," and made in defiance of said act, and with deliberate purpose to evade its provisions; that said contracts provided for secret rebates based upon a schedule of the amount of powder purchased annually as follows, to wit: A purchase of more than five hun-

dred (500) and less than one thousand (1,000) kegs annually entitled the purchaser to a rebate of five (5) cents per keg; more than one thousand (1,000) and less than twenty-five hundred (2,500) kegs, a rebate of ten (10) cents per keg; more than twenty-five hundred (2,500) and less than five thousand (5,000) kegs, a rebate of fifteen (15) cents per keg; more than five thousand (5,000) and less than ten thousand (10,000) kegs, a rebate of seventeen and one-half (17½) cents per keg; more than ten thousand (10,000) and less than twenty-five thousand (25,000) kegs, a rebate of twenty (20) cents per keg; over twenty-five thousand (25,000) kegs, a rebate of twenty-two and one-half (22½) cents per keg. And plaintiff further shows that in cases where the consumer could not be induced to contract as aforesaid, a "special cut price" was issued for his benefit, of which he was permitted to take advantage at any time he desired, to the same effect as if he had signed such contract, and by reason of the fact that such special price was far below a fair and living price for said powder and did not afford a fair profit therefor, or in fact any profit whatsoever, it was impossible for plaintiff to compete for the trade of such consumer, and his trade went to said defendant as effectively as if covered by a formal contract. And plaintiff further shows that in those cases where a customer was already under contract with the said defendant at the time when plaintiff began business, the said defendant, realizing the insufficiency of said contracts to bind said consumer lawfully, and in order to forestall plaintiff in its efforts to secure the trade of said consumer in open and free competition, voluntarily increased the secret rebates specified therein, and made such increases effective immediately and to continue for, the unexpired term of the contract, upon the condition that said exclusive contract should and would be extended and continued at its expiration for a further term of years; that the amount of the rebate and the increase of rebate was not regulated or determined by any law of supply and demand, but was determined solely by the necessity of making a price which would be sufficient to induce the consumer to give all his trade to the said defendant, and take him out of the open market for a long period of time, at least until plaintiff had been coerced into submission or forced to retire from business; that said defendant was able to. and in some cases did, contract to supply said powder at less than the actual cost thereof, without any regard whatsoever to a fair and living profit or any profit thereon, which said defendant was enabled to do by reason of the fact that all losses which it might thereby sustain should and would be apportioned among and made up to it pro rata by the other defendants herein.

Twelfth. Plaintiff shows that, in furtherance of the purpose of the defendants to monopolize and control the trade of powder and other explosives, the defendant E. I. Du Pont de Nemours Powder Company shortly after its incorporation created a board, known as the "Sales Board" and composed of a director of sales and assistant directors, who exercised the power to fix prices and establish policies which all the other defendants and parties to the unlawful combination and conspiracy were compelled to observe; that no regular or fixed price list was issued, but the prices which were established from time to time were purely arbitrary; that in those states, territories, or foreign countries where the defendants were in full control of the powder trade such prices were always fixed so as to leave substantial and sometimes excessive margins of profit, but that in those states, territories, and foreign countries where the defendants or some of them were conducting business in competition, or in danger of competition, such prices were regulated and determined solely with the object in view of preventing all manufacturers not parties to the conspiracy from obtaining a fair proportion or any of the powder trade, and not with a view of obtaining business for itself at a fair margin of profit, so that said defendant might have a clear field to make any prices it should thereafter see fit, and without regard to the interest of the consumer. And plaintiff further shows that for a period of more than five years it was continuously forced to meet the prices thus fixed by said defendant in an endeavor to obtain and retain enough business to keep its mills and plant operating and to obtain its fair share of the powder trade in said states, territory, and foreign country; but plaintiff was unable to offer to supply such powder at any

price below which said defendant would not go, and wherever and whenever the business of the consumer was submitted for bid, or to competition, in almost every case the said defendant would underbid plaintiff by persistently reducing its price at from five to ten cents per keg, and thus not only depriving plaintiff of said business, but sometimes making sales at an actual loss: that in this manner plaintiff would ultimately be compelled to surrender the business of such consumer and leave the said defendant a clear field to make up its losses by fixing any price it might thereafter see fit; and by reason of the matters and things alleged in this paragraph plaintiff suffered irreparable losses, not only in the loss of the fair profits which would have come to it from each contract which it was thus prevented from securing, but from the extension of its business so as to keep its mills and plant continuously operating. And plaintiff further shows that the said defendant E. I. Du Pont de Nemours Powder Company, in pursuance of the policy and practices in this paragraph set forth, has in most cases ultimately succeeded in inducing the purchasers of black blasting powder to enter into contracts with it for a period of years according to the tenor and effect hereinbefore in the last preceding paragraph set forth, and has thereby gradually removed the danger of competition in the powder trade in said states, territory, and foreign country by absorbing more than ninety-five per cent. thereof.

Thirteenth. Plaintiff shows that on or about the 10th day of January, 1904, an explosion occurred at its said plant and mills whereby a large part thereof was totally destroyed, entailing a heavy direct loss upon plaintiff on account of the destruction of said property, and further serious losses on account of the enforced idleness of the remainder of said plant and mills during the time required for rebuilding; and your plaintiff further shows that said explosion occurred in this wise, namely: During the noon hour on said day, while the employés who had been assigned to work in that portion of said plant which was destroyed were absent therefrom at luncheon, some person or persons unknown to plaintiff entered the said building and distributed matches which had been previously colored with black ink along the floor and walks where powder dust had settled, and where they would ignite if stepped upon; that upon the return of said employés they immediately discovered that the doors to said buildings had been opened, and upon entering also discovered some of the matches distributed as aforesaid; that immediately upon the matter being reported to the official in charge of said buildings, instructions were given to the said employés to remove their shoes and make a careful search for said matches upon their hands and knees; that while thus engaged an explosion occurred, and two of said employés were killed and others seriously injured. And plaintiff further shows that immediately after said explosion the agents of said defendant caused to be printed and distributed among its own and plaintiff's customers large numbers of exaggerated reports of the extent of the damage done by said explosion, and endeavored to create a feeling of uncertainty among consumers generally, and among plaintiff's customers in particular, concerning plaintiff's ability to meet their future requirements for black blasting powder, with a view to inducing, and in some cases thereby succeeded in inducing, said consumers to enter into exclusive contracts with said defendant to supply them with black blasting powder, said contracts being of the tenor and effect hereinbefore in paragraph eleventh particularly set forth.

Fourteenth. Plaintiff shows that the defendant E. I. Du Pont de Nemours Powder Company, in order to forestall and prevent the construction of powder mills throughout the United States and foreign countries, and to prevent competition, and with the purpose of securing to itself and its associates in said unlawful combination and conspiracy to monopolize the powder trade, further conspired, combined, confederated, and agreed to and with various persons, corporations, and associations engaged in the manufacture of powder-making machinery for the purpose of obtaining the exclusive use and control of powder-making machinery, and thereby to limit the sale and use of such machinery to themselves and their associates; and by threatening to refuse to purchase powder-making machinery of any maker who would not give it and them such exclusive right the said E. I. Du Pont de Nemours Powder

Company succeeded in intimidating many powder machinery makers, and thereby induced them to refuse to sell such machinery to any person, corporation, or association not a party to the said combination and conspiracy. And plaintiff shows that at the time when plaintiff decided upon the construction of its plant as aforesaid, plaintiff sought to purchase the necessary machinery for use in said plant from various manufacturers of high-grade powder-making machinery, to wit: The Prox-Brinkman Manufacturing Company, of Terre Haute, Indiana, and Olin Scott of Bennington, Vermont, and I. & E. Greenwald Co., of Cincinnati, Ohio, and others; that at the behest of the said defendant E. I. Du Pont de Nemours Powder Company, and in pursuance of said unlawful agreement, said manufacturers declined to supply such machinery to plaintiff upon the ground that the said defendants had insisted generally, and particularly in the case of plaintiff, upon a strict compliance with the terms of the said agreement, under penalty of the loss of future patronage of the said defendant and its associates in said combination and conspiracy; and thereby plaintiff was compelled to and did contract for the manufacture of said machinery especially for its purposes with other persons, and paid therefor a much higher price than the usual and customary cost of similar powder-making machinery, and largely in excess of the cost of similar powder-making machinery to the said defendant and its associates, and largely in excess of what plaintiff could have obtained said machinery for, but for the threats, intimidation, and unlawful conduct hereinbefore in this paragraph set forth, to the damage of plaintiff in the sum of five thousand dollars ($5,000).

Fifteenth. Plaintiff shows that, being unable to withstand the great and continuing losses forced upon it by reason of the unlawful and wrongful acts of the defendants as hereinbefore set forth, it was finally compelled to offer its mills, plant, and business for sale; that the methods and conduct of the defendants toward plaintiff had become generally known among powder manufacturers and dealers throughout the United States and foreign countries, as well as among the usual investors in property owned and used for the manufacture and sale of powder, and it was generally known that the methods employed by the defendants, and particularly by the defendant E. I. Du Pont de Nemours Powder Company against plaintiff, were the methods that had long been similarly employed against other manufacturers and vendors of powder who had attempted to operate independently of the defendants, or some of them, from time to time engaged in the conspiracy to monopolize the trade in explosives, and that generally independent operators had been unable to survive the combined assaults of said defendants, and for this reason there was no market for such property, except among the defendants, or some of them, and among investors who had been accustomed to invest only in such properties as were operated or controlled by the defendants, or some of them; and plaintiff, not being able to find a purchaser, or in fact to obtain any bid or offer from any source, finally solicited the defendants, or some of them, to purchase its mills and plant at the fair value thereof, and also to purchase its business, good will, and stock on hand, for the fair and reasonable value thereof, but all efforts to induce any of said defendants to consent to purchase said properties, or any of said properties, at the fair and reasonable value thereof totally failed, and plaintiff was then compelled, in order to keep said properties from going to waste, and in order to avoid suffering a total and irretrievable loss of the entire value of said properties, to accept any offer that it might be able to obtain therefor, without any regard whatsoever to the true and fair value thereof; and thereafter, to wit, on or about the 19th day of September, 1908, plaintiff sold and disposed of its entire plant, mills, business, and good will for the total sum of seventy thousand dollars ($70,000), and the stock on hand for five thousand five hundred and four and four 8/100 dollars ($5,504.08) additional. And plaintiff further shows that the nominal purchaser of said property was one Franklin W. Olin, of the city of Alton, state of Illinois; but plaintiff states that the said Olin purchased the same at the instance and request of the defendant E. I. Du Pont de Nemours Powder Company and others of the defendants herein, and under and in pursuance of a contract with the defendant E. I. Du Pont de Nemours Powder Com-

pany and others associated with it at said time in said unlawful combination and conspiracy, whereby the said E. I. Du Pont de Nemours Powder Company and said associates agreed to purchase ninety-five per cent. (95%) of the future entire output of said mills and plant for a long period of time; that immediately after the said properties were so purchased by said Olin, a corporation was organized for the purpose of taking over and operating the same, said corporation being designated the Western Powder Manufacturing Company, and the said properties were thereupon transferred to said Western Powder Manufacturing Company, and it has ever since held the title to the same. And plaintiff further shows that the said Franklin W. Olin was at the time the president of the Equitable Manufacturing Company, forty-nine per cent. (49%) of the stock of which said company was then and is now held by the said defendant E. I. Du Pont de Nemours Powder Company, and which said Equitable Manufacturing Company had been theretofore for a long period associated with the said E. I. Du Pont de Nemours Powder Company in the said unlawful combination and conspiracy; that immediately after said purchase and transfer of said mills, plant, and business to the said Western Powder Manufacturing Company, the same began operating to the full capacity thereof, and have so continued down to the present time; that the entire output of said mills and plant was at once allotted and apportioned to the said E. I. Du Pont de Nemours Powder Company and its associates under said contract, and has ever since been and is being disposed of at the fair value thereof, and the business of said company at once became and ever since has been very profitable; that plaintiff further shows that at the time when it was so wrongfully compelled to sell and dispose of its plant, mills, business, and good will, as hereinbefore in this paragraph set forth, the true and fair value thereof was the sum of five hundred thousand dollars ($500,000), and plaintiff has suffered damage on account thereof in the sum of four hundred thirty thousand dollars ($430,000).

Sixteenth. Plaintiff shows that its mills and plant were equipped and designed to do a large and profitable business with users and dealers in explosives, and particularly black blasting powder; that, when operating at full capacity, it employed a large force of men in the manufacture of such powder, and was capable of producing one thousand (1,000) kegs daily; that the total annual capacity of said mills and plant, based upon three hundred (300) working days per year, was three hundred thousand (300,000) kegs of black blasting powder; that plaintiff began the manufacture of such powder on or about the 1st day of October, 1903; that during the year 1904, it manufactured and sold a total of only one hundred eight thousand seven hundred ninety-eight (108,798) kegs, and during the year 1905 a total of one hundred fifty-eight thousand one hundred six (158,106) kegs, and during the year 1907 a total of eighty-six thousand three hundred seventy-five (86,375) kegs, and from January 1 to August 31, 1908, a total of thirty-two thousand and fifty-nine (32,059) kegs; that the inability of plaintiff to keep its plant and mills working at the full capacity thereof was due to and was the natural and proximate consequence of the wrongful and unlawful acts of the defendants, as hereinbefore set forth; that every effort was made by plaintiff during all of said period, not only to increase its sales and keep its mills and plant operating to the full capacity thereof, but to maintain its customers and prevent the falling off of said sales, but by reason of the unfair, unlawful, and wrongful conduct of the defendants, and particularly of the defendant E. I. Du Pont de Nemours Powder Company, its agents, officers, and employés, as hereinbefore alleged, plaintiff was prevented from obtaining a fair share of the trade in black blasting powder and other explosives in said states, territory, and foreign countries, and was prevented from making a fair and reasonable profit on the powder manufactured and sold by it as above set forth. And plaintiff shows that it was especially well equipped to secure a fair and reasonable portion of the said powder trade in fair and open competition; that said R. S. Waddell had full charge of the sales department of plaintiff, and that he carried on a persistent and energetic campaign, during the entire period aforesaid, for a fair share of

the powder trade in said states, territory, and foreign country, and the business of plaintiff would have grown and increased from year to year, instead of decreasing as above stated, but for the acts of the defendants, and particularly the defendant E. I. Du Pont de Nemours Powder Company, as aforesaid; that the natural demand for black blasting powder within said states, territory, and foreign country was sufficient to enable plaintiff to keep its mills and plant working to the full capacity thereof and its employés steadily employed. And plaintiff shows that its failure to keep its mills and plant working to the full capacity thereof, and to prevent a falling off of its business from year to year, instead of an increase thereof, was the natural and proximate consequence of the said acts of said defendants. And plaintiff shows that by reason of said unlawful and wrongful acts it sustained further losses as follows, to wit, the loss of the fair and reasonable profits on one hundred ninety-one thousand two hundred and two (191,202) kegs of black blasting powder, which it was prevented from manufacturing and selling during the year 1904, and one hundred forty-one thousand eight hundred and ninety-four (141,894) kegs during the year 1905, and two hundred twenty-five thousand two hundred and fourteen (225,214) kegs during the year 1906, and two hundred thirteen thousand six hundred and twenty-five (213,625) kegs during the year 1907, and one hundred sixty-five thousand four hundred and forty-one (165,441) kegs during the period extending from January 1 to August 31, 1908, making a total of nine hundred thirty-seven thousand three hundred and seventy-six (937,376) kegs, which it was thus prevented from manufacturing and selling previous to the time when it was forced by the defendants to dispose of its mills and plant and retire from business; that the fair and reasonable profits of said business which it was thus prevented from acquiring was the sum of thirty (30) cents per keg, after deducting all expenses connected with the manufacture, sale and transportation, or a total of two hundred eighty-one thousand two hundred and twelve and $80/100$ dollars ($281,212.80). And plaintiff further shows that if it had not been driven out of business by the defendants as aforesaid, and if it had not been unjustly and unlawfully interfered with in its right to continue in business and make fair and reasonable profits from the manufacture and sale of black blasting powder to the full capacity of its mills and plant from the 19th day of September, 1908, to the present time, it would have manufactured and sold during the said period three hundred thousand (300,000) kegs per annum, or a total of nine hundred thousand (900,000) kegs additional, upon which it would have made a profit of thirty (30) cents per keg, or a total of two hundred seventy thousand dollars ($270,000) more. And plaintiff further shows that the fair profit on the powder which it actually manufactured and sold, as hereinbefore stated, and which it wholly lost by reason of the unjust and unlawful and wrongful acts of the defendants, as aforesaid, amounted to the sum of thirty (30) cents per keg on four hundred sixty-seven thousand one hundred and sixty-seven (467,167) kegs, or a total of one hundred thirty-nine thousand one hundred and forty-nine and $10/100$ dollars ($139,149.10), making a total loss of profits resulting as the natural and proximate consequence of the acts of the defendants, as hereinbefore in this paragraph set forth, in the sum of six hundred ninety thousand three hundred sixty-one and $90/100$ ($690,361.90).

Seventeenth. That with the intent to impede, impair, injure, and destroy the business of plaintiff, the defendants, and particularly the defendant E. I. Du Pont de Nemours Powder Company, maliciously, wantonly, willfully, oppressively, and wickedly, through their officers and agents, acting within the scope of their employment and by direction of and with the approval of the defendants, and particularly the defendant E. I. Du Pont de Nemours Powder Company, committed the wrongs herein set forth, whereby the business and property of plaintiff was injured and impaired and totally destroyed, to its further damage, and by reason thereof plaintiff is entitled to recover punitive or vindictive damages against said defendants, and particularly against the defendant E. I. Du Pont de Nemours Powder Company, in the sum of five hundred thousand dollars ($500,000).

Wherefore plaintiff prays that, by reason of the matters and things hereinbefore set forth, it do have and recover judgment of and from the defend-

ants herein, and each of them, for three-fold the damages suffered by it, amounting to the sum of one million one hundred nineteen thousand nine hundred and fifty-seven and $82/100$ dollars ($1,119,957.82), as actual damages, and the sum of five hundred thousand dollars ($500,000), as vindictive or punitive damages, or the total sum of four million eight hundred and fifty-nine thousand nine hundred seventy-three and $46/100$ dollars ($4,859,973.46), for a reasonable attorney's fee, and for its costs and disbursements herein, as authorized by law in such cases made and provided.